# UNITED STATES DISTRICT COURT

EASTERN DISTRICT OF CALIFORNIA – FRESNO DIVISION

| | |
|---|---|
| PA DEE THAO, | 1:10-CV-0244-SKO |
| Plaintiff, | **ORDER REGARDING PLAINTIFF'S SOCIAL SECURITY COMPLAINT** |
| v. | (Doc. 1) |
| MICHAEL J. ASTRUE,<br>Commissioner of Social Security, | |
| Defendant. | |

## BACKGROUND

Plaintiff seeks judicial review of a final decision of the Commissioner of Social Security (the "Commissioner" or "Defendant") denying her application for Supplemental Security Income ("SSI") pursuant to Titles XVI of the Social Security Act. 42 U.S.C. § 1383(c)(3). The matter is currently before the Court on the parties' briefs, which were submitted, without oral argument, to the Honorable Sheila K. Oberto, United States Magistrate Judge.[1]

---

[1] The parties consented to the jurisdiction of the United States Magistrate Judge. (Docs. 9, 10.) On April 8, 2010, the action was reassigned to the Honorable Sheila K. Oberto for all purposes. *See* 28 U.S.C. § 636(c); Fed. R. Civ. P. 73; *see also* L.R. 301, 305.

**FACTUAL BACKGROUND**

Plaintiff was born in 1984, completed the 12th grade, and last worked at a part-time summer job in the park during her junior year of high school. (Administrative Record ("AR") 111, 131, 26.) On December 15, 2006, Plaintiff filed an application for SSI, claiming disability beginning on March 1, 2002, due to seizures. (AR 111-17, 126-32.)

**A.     Medical Evidence**

Plaintiff alleges that she became disabled on March 1, 2002, when she was 17 years old, due to seizures, headaches, and neck pain. (AR 111, 127.) Plaintiff's mother indicated that the seizures may have been related to Plaintiff taking diet pills when she was 15 to 16 years old, as the seizures began shortly thereafter. (AR 160.) Plaintiff also reported that she received a head trauma from an old boyfriend in 2001 or 2002. (AR 187, 222.)

On September 21, 2006, Plaintiff was seen at University Medical Center for treatment of her seizures. (AR 187.) Plaintiff stated that the seizures had been occurring for approximately two years, always at night. (AR 187.) Plaintiff had been taking Dilantin to control the seizures but indicated that the medication had been "no help." (AR 187.) At that visit, Plaintiff was provided with 600 mg of Dilantin, and prescribed 300 mg daily. (AR 187.) Plaintiff returned to the University Medical Center on October 12, 2006, with a "toxic" level of Dilantin, reporting that she had been feeling "dizzy," "very sedated," and "off-balance." (AR 186.) Plaintiff's Dilantin dosage was reduced to 100 mg daily, and she was directed to return to the clinic for follow-up evaluation. (AR 186.) On December 29, 2006, Plaintiff indicated that she was still experiencing seizures and that they were "not controlled" through Dilantin. (AR 199.) However, there was also a question as to whether Plaintiff was taking Dilantin; the notes further indicated that she was a "poor historian" and questioned if she was "learning disabled." (AR 199.)

On February 1, 2007, Plaintiff was seen by Greg Hirokawa, Ph.D. for a comprehensive psychiatric evaluation. (AR 188-96.) Dr. Hirokawa found that Plaintiff's "[s]tream of mental activity was slow" but that "[a]ssociation of thought was within normal limits and well organized." (AR 190.) Plaintiff stated that she was taking Dilantin at the time of the exam but that she needed to be reminded to take her medication. (AR 189, 191.) Dr. Hirokawa indicated that Plaintiff

appeared "to have suffered personality and cognitive changes after the onset of her seizure" but that she was "currently not receiving treatment for this disorder." (AR 191.) Dr. Hirokawa opined that Plaintiff had mild to moderate limitations in her ability to remember location and work-like procedure and mild limitations in her ability to accept instructions from a supervisor, to sustain an ordinary routine without special supervision, to complete a normal workday, to interact with coworkers, and to deal with various changes in the work setting. (AR 191-92.) Plaintiff had mild limitations in her ability to understand and remember very short and simple instructions, mild to moderate limitations in her ability to remember detailed instructions, and moderate limitations in her ability to maintain attention and concentration for extended periods. (AR 192.)

On February 3, 2007, Juliane Tran, M.D. provided a comprehensive neurological evaluation. (AR 193-96.) Dr. Tran indicated that Plaintiff was "confused when answering questions" and was a "very poor historian." (AR 193, 194.) Plaintiff did not remember her first seizure episode and she thought that the frequency of the seizures was once every two weeks. (AR 193.) Dr. Tran found that Plaintiff had a "[p]robable generalized seizure and . . . also a cognitive deficit." (AR 196.) Plaintiff had "poor abstract thinking," "poor insight and judgment," "poor short-term recall ability and poor calculation." (AR 196.) Dr. Tran opined that Plaintiff would "need help" handling her finances and should not drive or operate machinery. (AR 196.) Plaintiff should be restricted to lifting not more than 20 pound occasionally and not more than 10 pounds frequently, but there were no restrictions as to sitting, standing, walking, bending, stooping, kneeling, or crouching. (AR 196.) Dr. Tran found that Plaintiff "probably can do multitask sequencing but she should not make decisions regarding public safety." (AR 196.)

On April 6, 2007, Plaintiff returned to University Medical Center and indicated that she had "finished Dilantin" one month prior and that she had a seizure one week prior to the visit. (AR 198.) The notes indicate that she had provided "slow responses" and again questioned if she was "learning disabled." (AR 198.) Plaintiff was prescribed Dilantin and was referred to a neurologist.

On May 9, 2007, Plaintiff was seen at the emergency room of Community Medical Center for treatment following a seizure. (AR 229-30.) Plaintiff had been off her seizure medication for

weeks. (AR 229.) According to the medical records, Plaintiff was then "loaded" with Dilantin. (AR 230.)

On May 21, 2007, Calmeze Dudley, M.D. reviewed Plaintiff's medical records and provided a mental residual functional capacity assessment ("RFC").[2] (AR 200-15.) Dr. Dudley determined that Plaintiff was moderately limited in her ability to carry out detailed instructions and to maintain attention and concentration for extended periods. (AR 200.) Plaintiff had cognitive and memory problems. (AR 204.) Dr. Dudley noted that Plaintiff had moderate difficulties in maintaining concentration, persistence, and pace. (AR 211.) However, Plaintiff was "capable of performing a full range of simple repetitive tasks without the need for special supervision." (AR 202.) Dr. Dudley further found that the "[s]eizure frequency as stated by claimant [was] not well documented." (AR 215.) Dr. Dudley adopted the findings of Dr. Tran. (AR 215.) On June 4, 2007, K.M. Quint, M.D. conducted a physical RFC assessment and also adopted Dr. Tran's findings. (AR 216-20.)

On May 23, 2007, Plaintiff was seen at University Medical Center. (AR 221-24.) Plaintiff's mother stated that Plaintiff's seizures would occur two to four times per month and would only happen while Plaintiff was sleeping. (AR 222.) The notes indicate that Plaintiff's seizures were "not controlled" with Dilantin. Plaintiff was within normal limits for all cranial nerve and motor functions, but had "bad" math skills. (AR 223.) It was recommended that Plaintiff taper of Dilantin and begin Keppra. (AR 224.)

On July 2, 2007, Plaintiff was again seen in the emergency room of Community Medical Center. (AR 226-27.) The progress notes indicate that Plaintiff had no seizure activity and a mild headache. (AR 227.) Plaintiff was informed that she should take her medication as prescribed. (AR 235.)

---

[2] RFC is an assessment of an individual's ability to do sustained work-related physical and mental activities in a work setting on a regular and continuing basis of 8 hours a day, for 5 days a week, or an equivalent work schedule. Social Security Ruling 96-8p. The RFC assessment considers only functional limitations and restrictions that result from an individual's medically determinable impairment or combination of impairments. *Id.* "In determining a claimant's RFC, an ALJ must consider all relevant evidence in the record including, *inter alia*, medical records, lay evidence, and 'the effects of symptoms, including pain, that are reasonably attributed to a medically determinable impairment.'" *Robbins v. Soc. Sec. Admin.*, 466 F.3d 880, 883 (9th Cir. 2006).

Plaintiff was seen for seizure treatment by emergency services of Community Medical Center on October 5, 2007, where she was found to be "non-compliant" for taking the medications Dilantin and Keppra. (AR 267.) She then had a follow-up visit on October 26, 2007, and indicated that she was "not taking" her medication. (AR 253.)

On November 20, 2007, Anne M. Khong, M.D. reviewed Plaintiff's records and provided a physical RFC assessment. (AR 237-45.) Dr. Khong found that Plaintiff should avoid concentrated exposure to hazards such as machinery and heights. (AR 240.) Dr. Khong noted that Plaintiff claimed to "always" take her medication, but found that Plaintiff "[d]oes not appear fully credible regarding med[ication] compliance." (AR 243-44.) Dr. Khong found the following:

> [Plaintiff's] alleged med[ication] compliance is not corroborated by the medical evid[ence] which, time after time, shows non-compliance w[ith] [seizure] med[ications]. In this context, it is unlikely that a change in her [seizure] med[ications] will effect any change in the reported [seizure] frequency. Better to keep her on a medication which can be measured to determine whether it is med[ication] compliance or drug efficacy at issue.

(AR 244.) Dr. Khong found that the "RFC is unlimited except for [seizure] precautions. There is no basis for exertional restrictions" and agreed with Dr. Dudley and Dr. Quint's prior RFC assessments. (AR 243-44.)

From February 2008 through May 2009, Plaintiff had several additional visits to Community Medical Center. (AR 247-78.) On February 26, 2008, Plaintiff indicated that her seizures were not controlled. (AR 252.) On July 10, 2008, Plaintiff was seen by emergency services for a seizure; the notes state that she had been noncompliant in taking Dilantin for months due to financial reasons. (AR 254, 258.) A computed tomography ("CT") scan was performed on Plaintiff's head, and the results were "normal." (AR 264.) On August 15, 2008, Plaintiff had a follow-up visit regarding her seizure disorder; she was "off" her medications at that time. (AR 251.) On August 27, 2008, Plaintiff indicated that she had lost her insurance and was unable to see a neurologist, but that she was currently on Dilantin. (AR 250.) Plaintiff was informed that she should maintain her current dosage level of Dilantin. (AR 251.) On September 4, 2008, the notes indicate that Plaintiff's Dilantin levels has been "supratherapeutic" the week before, and she had been instructed to stop her Dilantin for two days and to follow up with a lower dosage. (AR 249.) Plaintiff indicated that she

had not had a new seizure since July 8, 2008.  (AR 249.)  On November 5, 2008, Plaintiff indicated that she had a seizure in the previous month.  (AR 247.)  Plaintiff did not like the medication Keppra because her "face turned blue," and she "restarted Dilantin."  (AR 247.)  She indicated that she was trying to get pregnant and was informed of the risks of Dilantin during pregnancy.  (AR 247.)  Plaintiff was instructed to wean off Dilantin and to start Lamictal.  (AR 247.)  On March 20, 2009, Plaintiff indicated that she had a seizure two days earlier and had run out of her medicine four days earlier.  (AR 277.)  Plaintiff was four months pregnant.  (AR 277.)  Plaintiff indicated that she wanted to drive because her seizures had only been at night for the past six months to one year.  (AR 277.)  On May 13, 2009, Plaintiff was 27 weeks pregnant, had not had a seizure since her last visit, and was "stable on Lamictal."  (AR 276.)

**B.      Administrative Hearing**

The Commissioner denied Plaintiff's applications initially and again on reconsideration; consequently, Plaintiff requested a hearing before an Administrative Law Judge ("ALJ").  (AR 63-67, 69-73, 74.)  On July 22, 2009, ALJ Christopher Larson held a hearing in which Plaintiff and vocational expert ("VE") Cheryl Chandler testified.  (AR 20-43.)

   **1.      Plaintiff's Testimony**

Plaintiff testified that she was 24 years old at the time, unmarried, had no children, and had completed high school.  (AR 25-26.)  She did not have a driver's license because her doctor would not approve her to drive due to her seizures.  (AR 26.)  The last time Plaintiff had worked was at a part-time summer job during her junior year of high school.  (AR 26.)  Plaintiff testified that she felt she could not work because she has a "headache" and was "dizzy all the time."  (AR 27.)  Her seizures began in 2002 and "just happened"; there was no injury that precipitated her seizures.  (AR 27.)  She could not recall if she had any seizures during the day since the date of her application in December 2006.  (AR 28.)  Plaintiff testified that, after a seizure occurs, she feels "weak" and has "no energy" – she "can't even get up."  (AR 28.)  This feeling lasts for two days and her mother and sister have to help her.  (AR 28.)  She testified that after a seizure her eyes would be "blurry" and that she could not "look at things clearly."  (AR 31.)  She also could not walk, feed, or dress herself.

(AR 31-32.) Her mother and sister would have to "lift" her up and give her medication. (AR 31.) Plaintiff stated that she would have this reaction "[a]bout two or three times" a month. (AR 32.)

Plaintiff said that she was taking Lamictal for her seizures and that she would "always remember" to take her medicine. (AR 28-29.) However, if Plaintiff did not remember to take her medication, a seizure would "just happen." (AR 29.) Plaintiff testified that her medication was switched to Lamictal from Dilantin and Keppra because seizures would "still happen" even when she took the prior medications. (AR 29.) Plaintiff did not remember how long she had been on Lamictal. (AR 30.) She had side effects while on Dilantin, and Keppra would turn her face purple after a seizure. (AR 29-30.) Plaintiff did not have any side effects from Lamictal. (AR 30.)

Plaintiff stated that she would get tired while trying to concentrate. (AR 32-33.) She could watch television for approximately 15 to 20 minutes and could read the newspaper for about five minutes before her eyes would start to hurt. (AR 33.) However, she could play with kids "for hours." (AR 33.) Plaintiff would rest after watching television and would nap for "more than an hour" "one or two times a day" due to daily headaches. (AR 34-35.) To treat her headaches, Plaintiff would "just drink water and just lay [sic] back." (AR 35.) She also had neck and back pain that would last all day. (AR 35.)

Plaintiff was unable to cook in front of a stove because it would make her "dizzy" but would "sometimes" help with cleaning, sweeping the floor, and laundry. (AR 35-36.) Plaintiff would go to church once a week but had no hobbies or interests since her seizures began. (AR 37.) She would get embarrassed when she went out and did not want people see her have a seizure. (AR 37.)

**2.    VE Testimony**

The ALJ questioned whether there were jobs available for a hypothetical worker of Plaintiff's age, education, and work experience who could never climb ladders, ropes, or scaffolds and must avoid concentrated exposure to hazards but who could perform simple, repetitive tasks. (AR 39.) The VE testified that there were light, sedentary jobs that excluded hazard factors that Plaintiff could perform such as ticket taker, usher, and retail sales clerk. (AR 39-40.) However, when the ALJ added the limitation that the hypothetical person required additional unscheduled breaks of at least an hour a day, the VE stated that there would be no jobs available with that limitation for someone

who is basically unskilled at work. (AR 40.) Plaintiff's attorney inquired as to whether there were jobs for someone with the characteristics of the first hypothetical but with moderate limitations for difficulties in concentration, persistence, and pace and would not be able to focus for one third of the time. (AR 41-42.) The VE indicated that there were no jobs available for such a hypothetical person. (AR 42.)

**C.     ALJ's Decision**

On September 25, 2009, the ALJ issued a decision finding Plaintiff not disabled since December 15, 2006, the date of her SSI application. (AR 7-19.)   Specifically, the ALJ found that (1) Plaintiff had not engaged in substantial gainful activity since the date of her application; (2) Plaintiff's impairments of seizure disorder and mood disorder were considered "severe" based on the requirements in the Code of Federal Regulation; (3) Plaintiff did not have an impairment or combination of impairments that met or equaled one of the impairments set forth in 20 C.F.R. Part 404, Subpart P, Appendix 1; (4) Plaintiff had an RFC to work at all exertional levels but could never climb ladders, ropes, or scaffolds and must avoid concentrated exposure to hazards; Plaintiff could perform simple, repetitive tasks; (5) Plaintiff had no past relevant work; (6) Plaintiff was defined as a younger individual on the alleged disability onset date; (7) Plaintiff had at least a high school education and was able to communicate in English; (8) the transferability of job skills was not an issue as Plaintiff had no past relevant work; (9) there are jobs that exist in significant numbers in the national economy that Plaintiff could perform; and (10) Plaintiff has not been under a disability as defined in the Social Security Act since December 15, 2006, the date of her application. (AR 12-18.)

Plaintiff sought review of this decision before the Appeals Council. On December 10, 2009, the Appeals Council denied review. (AR 1-3.) Therefore, the ALJ's decision became the final decision of the Commissioner. 20 C.F.R. §§ 404.981, 416.1481.

**D.     Plaintiff's Contentions on Appeal**

On February 9, 2010, Plaintiff filed a complaint before this Court seeking review of the ALJ's decision. Plaintiff contends that the ALJ (1) failed to provide proper reasons in finding Plaintiff's testimony only partially credible as related to her medication compliance, and (2) failed to properly evaluate evidence of Plaintiff's pace limitations.

**SCOPE OF REVIEW**

The ALJ's decision denying benefits "will be disturbed only if that decision is not supported by substantial evidence or it is based upon legal error." *Tidwell v. Apfel*, 161 F.3d 599, 601 (9th Cir. 1999). In reviewing the Commissioner's decision, the Court may not substitute its judgment for that of the Commissioner. *Macri v. Chater*, 93 F.3d 540, 543 (9th Cir. 1996). Instead, the Court must determine whether the Commissioner applied the proper legal standards and whether substantial evidence exists in the record to support the Commissioner's findings. *See Lewis v. Astrue*, 498 F.3d 909, 911 (9th Cir. 2007).

"Substantial evidence is more than a mere scintilla but less than a preponderance." *Ryan v. Comm'r of Soc. Sec.*, 528 F.3d 1194, 1198 (9th Cir. 2008). "Substantial evidence" means "such relevant evidence as a reasonable mind might accept as adequate to support a conclusion." *Richardson v. Perales*, 402 U.S. 389, 401 (1971) (quoting *Consol. Edison Co. of N.Y. v. NLRB*, 305 U.S. 197, 229 (1938)). The Court "must consider the entire record as a whole, weighing both the evidence that supports and the evidence that detracts from the Commissioner's conclusion, and may not affirm simply by isolating a specific quantum of supporting evidence." *Lingenfelter v. Astrue*, 504 F.3d 1028, 1035 (9th Cir. 2007) (citation and internal quotation marks omitted).

**APPLICABLE LAW**

An individual is considered disabled for purposes of disability benefits if she is unable to engage in any substantial, gainful activity by reason of any medically determinable physical or mental impairment that can be expected to result in death or that has lasted, or can be expected to last, for a continuous period of not less than twelve months. 42 U.S.C. §§ 423(d)(1)(A), 1382c(a)(3)(A); *see also Barnhart v. Thomas*, 540 U.S. 20, 23 (2003). The impairment or impairments must result from anatomical, physiological, or psychological abnormalities that are demonstrable by medically accepted clinical and laboratory diagnostic techniques and must be of such severity that the claimant is not only unable to do her previous work, but cannot, considering her age, education, and work experience, engage in any other kind of substantial, gainful work that exists in the national economy. 42 U.S.C. §§ 423(d)(2)-(3), 1382c(a)(3)(B), (D).

The regulations provide that the ALJ must undertake a specific five-step sequential analysis in the process of evaluating a disability. In the First Step, the ALJ must determine whether the claimant is currently engaged in substantial gainful activity. 20 C.F.R. §§ 404.1520(b), 416.920(b). If not, in the Second Step, the ALJ must determine whether the claimant has a severe impairment or a combination of impairments significantly limiting her from performing basic work activities. *Id.* §§ 404.1520(c), 416.920(c). If so, in the Third Step, the ALJ must determine whether the claimant has a severe impairment or combination of impairments that meets or equals the requirements of the Listing of Impairments ("Listing"), 20 C.F.R. 404, Subpart P, App. 1. *Id.* §§ 404.1520(d), 416.920(d). If not, in the Fourth Step, the ALJ must determine whether the claimant has sufficient RFC despite the impairment or various limitations to perform her past work. *Id.* §§ 404.1520(f), 416.920(f). If not, in the Fifth Step, the burden shifts to the Commissioner to show that the claimant can perform other work that exists in significant numbers in the national economy. *Id.* §§ 404.1520(g), 416.920(g). If a claimant is found to be disabled or not disabled at any step in the sequence, there is no need to consider subsequent steps. *Tackett v. Apfel*, 180 F.3d 1094, 1098-99 (9th Cir. 1999); 20 C.F.R. §§ 404.1520, 416.920.

**DISCUSSION**

**A.    Plaintiff's Credibility Concerning Her Medication Compliance**

Plaintiff contends that the ALJ's rejection of Plaintiff's testimony concerning the severity of her symptoms was not supported by the ALJ's finding that Plaintiff was noncompliant with prescribed treatment because any noncompliance was justifiable. The Commissioner argues that the ALJ properly considered Plaintiff's noncompliance in finding that Plaintiff not entirely credible.

In considering Plaintiff's credibility, the ALJ found that Plaintiff's "medically determinable impairments could reasonably be expected to cause the alleged symptoms, but her statements about the intensity, persistence and limiting effects of those symptoms are not credible to the extent they are inconsistent with [the] assessment of her residual functional capacity." (AR 14.)

**1.    Legal Standard**

In evaluating the credibility of a claimant's testimony regarding subjective symptoms, an ALJ must engage in a two-step analysis. *Vasquez v. Astrue*, 572 F.3d 586, 591 (9th Cir. 2009). First, the

10

ALJ must determine whether the claimant has presented objective medical evidence of an underlying impairment that could reasonably be expected to produce the pain or other symptoms alleged. *Id.* The claimant is not required to show that her impairment "could reasonably be expected to cause the severity of the symptom she has alleged; she need only show that it could reasonably have caused some degree of the symptom." *Id.* (quoting *Lingenfelter*, 504 F.3d at 1036). If the claimant meets the first test and there is no evidence of malingering, the ALJ can only reject the claimant's testimony about the severity of the symptoms if he gives "specific, clear and convincing reasons" for the rejection. *Id.* As the Ninth Circuit has explained:

> The ALJ may consider many factors in weighing a claimant's credibility, including (1) ordinary techniques of credibility evaluation, such as the claimant's reputation for lying, prior inconsistent statements concerning the symptoms, and other testimony by the claimant that appears less than candid; (2) unexplained or inadequately explained failure to seek treatment or to follow a prescribed course of treatment; and (3) the claimant's daily activities. If the ALJ's finding is supported by substantial evidence, the court may not engage in second-guessing.

*Tommasetti v. Astrue*, 533 F.3d 1035, 1039 (9th Cir. 2008) (citations and internal quotation marks omitted); *see also Bray v. Comm'r of Soc. Sec. Admin.*, 554 F.3d 1219, 1226-27 (9th Cir. 2009); 20 C.F.R. §§ 404.1529, 416.929. Other factors the ALJ may consider include a claimant's work record and testimony from physicians and third parties concerning the nature, severity, and effect of the symptoms of which he complains. *Light v. Soc. Sec. Admin.*, 119 F.3d 789, 792 (9th Cir. 1997).

### 2. The ALJ Provided Clear and Convincing Reasons for Rejecting Plaintiff's Subjective Complaints and Finding that Plaintiff Lacked Credibility

The ALJ found that Plaintiff's medically determinable impairments could reasonably be expected to produce the alleged symptoms. (AR 14.) Therefore, absent affirmative evidence of malingering, the ALJ's reasons for rejecting Plaintiff's testimony must be clear and convincing. *Vasquez*, 572 F.3d at 591.

Plaintiff asserts that the ALJ erred in his rejection of Plaintiff's testimony concerning the severity of her symptoms based on her noncompliance with prescribed treatment. Plaintiff argues that her noncompliance was reasonable due to the medication's failure to control her seizures and her inability to afford the medication.

A claimant's failure to follow prescribed medical treatment supports a finding that the claimant is not disabled. *See* 20 C.F.R. §§ 404.1530(b), 416.930(b). "Impairments that can be controlled effectively with medication are not disabling for the purpose of determining eligibility for SSI benefits." *Warre v. Comm'r of Soc. Sec. Admin.*, 439 F.3d 1001, 1006 (9th Cir. 2006). However, Social Security Ruling ("SSR") 82-59 states that the Social Security Administration ("SSA") may only make a determination that a claimant failed to follow prescribed treatment when all of the following conditions exist: (1) the individual's impairment precludes engaging in any substantial activity; (2) the impairment has lasted or is expected to last for 12 continuous months or is expected to result in death; (3) treatment that is clearly expected to restore capacity to engage in a substantial gainful activity has been prescribed by a treating source; and (4) the evidence of the record discloses that there has been a refusal to follow prescribed treatment. SSR 82-59. "Where SSA makes a determination of 'failure,' a determination must also be made as to whether or not failure to follow prescribed treatment is justifiable." *Id*. Here, Plaintiff contends that her noncompliance regarding her medication was justifiable because "the record shows an individual who was constantly battling the ability to afford and obtain care through the county facilities and, more importantly, the Dilantin was not effective in controlling her symptoms." (Doc. 14, 8:13-16.)

Plaintiff's contentions are not supported by the record. It is true that the Commissioner cannot "deny benefits to someone because he is too poor to obtain medical treatment that may help him." *Gamble v. Chater*, 68 F.3d 319, 322 (9th Cir. 1995) (citation omitted). However, the treatment records relied upon by the ALJ do not indicate that Plaintiff was noncompliant with her medication due to financial hardship (or, for that matter, for any other reason), or that Plaintiff was "constantly battling the ability to afford and obtain care." The record shows treatment beginning on September 21, 2006, and lasting through May 13, 2009. (AR 186-278.) There was only one instance in the record – when Plaintiff was seen through emergency services at Community Medical Center on July 10, 2008 – that indicates that Plaintiff was noncompliant with Dilantin due to "financial" reasons. (AR 254.) This visit is almost two years after the treatment record began. There is no other mention in the record of Plaintiff being unable to obtain medication for due to financial issues. The record does indicate that a month and a half later – on August 27, 2008 – that Plaintiff was unable

to see a neurologist because she had lost her insurance. (AR 250.) However, the record also indicates that on that date Plaintiff was "currently on [D]ilantin" and thus does not indicate noncompliance with prescription medication due to financial concerns. (AR 250.)

The ALJ's finding that Plaintiff had been noncompliant with prescribed treatment is supported by the record, which indicates numerous instances that Plaintiff had issues with taking her prescribed seizure medication. University Medical Center indicated that on September 21, 2006, Plaintiff was being treated for seizures as a "new patient" and that she was currently on no medication but had been "formerly on Dilantin." (AR 187.) On October 12, 2006, Plaintiff had a "toxic" level of Dilantin. (AR 186.) On December 29, 2006, Plaintiff indicated that she was still experiencing seizures and that they were "not controlled" through Dilantin; however, it was questioned whether Plaintiff was taking Dilantin. (AR 199.) On April 6, 2007, Plaintiff indicated that she had "finished Dilantin" one month prior and that she had a seizure one week prior to the visit. (AR 198.) On May 9, 2007, Plaintiff was seen at the emergency room for treatment following a seizure and indicated that she had been off her seizure medication for weeks. (AR 229.) Plaintiff was seen by emergency services on October 5, 2007, where she was found to be "non-compliant" with Dilantin and Keppra. (AR 267.) She had a follow-up visit on October 26, 2007, and indicated that she was "not taking" her medication. (AR 253.) On July 10, 2008, Plaintiff was seen for a seizure and she had been non-complaint for Dilantin for months. (AR 254, 258.) On August 15, 2008, Plaintiff had a follow-up visit; she was "off" her medications at that time. (AR 251.) On September 4, 2008, the notes indicate that Plaintiff's Dilantin levels has been "supratherapeutic" the week before and she had been instructed to stop her Dilantin for two days and to follow up with a lower dosage. (AR 249.) On November 5, 2008, Plaintiff indicated that she had a seizure during the previous month but that she did not like the medication Keppra because her "face turned blue" and that she had "restarted Dilantin." (AR 247.) On March 20, 2009, Plaintiff indicated that she had a seizure two days earlier and had run out of her medication four days earlier. (AR 277.) However, on May 13, 2009, Plaintiff had not had a seizure since her last visit, and was "stable on Lamictal." (AR 276.)

The ALJ's decision clearly documents Plaintiff's noncompliance with prescribed treatment. The ALJ noted that Plaintiff had seizures when she had "'finished the Dilantin' 1 month earlier," when she "had been off medications for 'weeks,'" and when "she had been out of medication for 4 days." (AR 15-16.) The ALJ also noted the issues Plaintiff had with her dosages, including when she had "toxic" and "supratheraputic" levels of Dilantin. (AR 15-16.) The ALJ further relied on state-agency evaluators who opined that Plaintiff's "alleged medication compliance was not corroborated by the medical evidence, which time after time shows noncompliance with seizure medications." (AR 17.) Accordingly, the ALJ gave "significant weight" to those opinions and "less weight to the opinion of the physician who declared [Plaintiff] temporarily disabled without consideration of her medication compliance." (AR 17.)

Plaintiff argues that her lack of compliance was justified because the Dilantin and Keppra did not control her seizures and notes that "[e]ven the State Agency reviewer notes noncompliance but states that 'it is unlikely that a change is her [seizure] med[ication] will effect any change in the reported [seizure] frequency." (Doc. 14, 11:14-16.) However, this finding is taken out of context. On November 20, 2007, Dr. Khong reviewed Plaintiff's records and stated that Plaintiff "[d]oes not appear fully credible regarding med[ication] compliance." (AR 244.) Dr. Khong found that the

> alleged med[ication] compliance is not corroborated by the medical evid[ence] which, time after time, shows non-compliance w[ith] [seizure] med[ications]. In this context, it is unlikely that a change in her [seizure] med[ications] will effect any change in the reported [seizure] frequency. Better to keep her on a medication which can be measured to determine whether it is med[ication] compliance or drug efficacy at issue.

(AR 244.) Thus, due to Plaintiff's noncompliance, Dr. Khong could not determine whether the complaint that her seizures were not controlled by medication was in fact due to actual drug efficacy or because of Plaintiff's failure to take her medication as prescribed. Dr. Khong thus recommended that Plaintiff remain on the medication so that the levels could be measured and a determination could be made as to the medication's effectiveness. Dr. Khong did not make a determination that the seizure medications were not effective in controlling Plaintiff's condition.

In sum, the ALJ cited clear and convincing reasons for rejecting Plaintiff's subjective complaints regarding the intensity, duration, and limiting effects of her symptoms. *See Batson v.*

*Comm'r of Soc. Sec. Admin.*, 359 F.3d 1190, 1196-97 (9th Cir. 2004) (claimant's contradictory testimony unsupported by objective medical evidence constituted substantial evidence in support of ALJ's negative credibility determination). Moreover, the ALJ's reasons were properly supported by the record and sufficiently specific to allow this Court to conclude that the ALJ rejected Plaintiff's testimony on permissible grounds and did not arbitrarily discredit Plaintiff's testimony. *See Turner v. Comm'r of Soc. Sec.*, 613 F.3d 1217, 1224 n.3 (9th Cir. 2010).

**B.     The ALJ's Consideration of Plaintiff's Pace Limitations**

The ALJ considered Plaintiff's mental impairments and found that she had "moderate difficulties" with regard to concentration, persistence and pace and limited her to simple, repetitive tasks. (AR 13-14.) Plaintiff contends that the record shows that she has significant pace limitations that the ALJ ignored, specifically chronic slowness and the inability to understand questions without the questions being repeated. The Commissioner argues that the ALJ findings are supported by the record. Further, the ALJ's decision assessed more severe restrictions than the findings by the examining physician and then incorporated those restrictions into an RFC limiting Plaintiff to simple, repetitive tasks.

### 1.     Legal Standard

The medical opinions of three types of medical sources are recognized in Social Security cases: "(1) those who treat the claimant (treating physicians); (2) those who examine but do not treat the claimant (examining physicians); and (3) those who neither examine nor treat the claimant (non-examining physicians)." *Lester v. Chater*, 81 F.3d 821, 830 (9th Cir. 1995).

Generally, a treating physician's opinion should be accorded more weight than opinions of doctors who did not treat the claimant, and an examining physician's opinion is entitled to greater weight than a non-examining physician's opinion. *Id.* Where a treating or examining physician's opinion is uncontradicted by another doctor, the Commissioner must provide "clear and convincing" reasons for rejecting the treating physician's ultimate conclusions. *Id.* If the treating or examining doctor's medical opinion is contradicted by another doctor, the Commissioner must provide "specific and legitimate" reasons for rejecting that medical opinion, and those reasons must be supported by substantial evidence in the record. *Id.* at 830-31; *accord Valentine v. Comm'r Soc. Sec. Admin.*,

574 F.3d 685, 692 (9th Cir. 2009). The ALJ can meet this burden by setting forth a detailed and thorough summary of the facts and conflicting clinical evidence, stating his interpretation thereof, and making findings. *Tommasetti*, 533 F.3d at 1041.

However, the ALJ "need not discuss *all* evidence presented" but instead must only "explain why 'significant probative evidence has been rejected.'" *Vincent v. Heckler* 739 F.2d 1393, 1394-95 (9th Cir. 1984) (quoting *Cotter v. Harris*, 642 F.2d 700, 706 (3d Cir.1981)). Further, a medical opinion is considered uncontroverted if all the underlying medical findings are similar. *See Sprague v. Bowen*, 812 F.2d 1226,1230 (9th Cir. 1987).

### 2. The ALJ Did Not Err in His Finding that Plaintiff had "Moderate" Pace Limitations and Limiting Plaintiff to Simple, Repetitive Tasks

Plaintiff argues that her noticeably slow pace is noted not only by the consultative examiners but also consistently by her treating physicians. The treatment notes indicate that Plaintiff has "slow responses," was a "poor historian," and question whether she is "learning disabled." (AR 198, 199, 259, 272.)

The examining physicians also indicated that Plaintiff had a noticeably slow pace. On February 1, 2007, Dr. Hirokawa performed a psychiatric evaluation and noted that Plaintiff's "[c]oncentration for conversation was poor due to the examiner having to repeat questions throughout the evaluation." (AR 190.) Dr. Hirokawa opined that Plaintiff had mild to moderate limitations in her ability to remember location and work-like procedure and mild limitations in her ability to accept instructions from a supervisor, to sustain an ordinary routine without special supervision, to complete a normal workday, to interact with coworkers, and to deal with various changes in the work setting. (AR 191-92.) Dr. Hirokawa further found that Plaintiff had mild limitations in her ability to understand and remember very short and simple instructions, mild to moderate limitations in her ability to remember detailed instructions, and moderate limitations in her ability to maintain attention and concentration for extended periods. (AR 192.)

On February 3, 2007, examining physician Dr. Tran performed a neurological evaluation and found that Plaintiff was a "very poor historian" and that it was "difficult to get information from her." (AR 193.) Further, Plaintiff was "confused when answering questions" and "needed questions

repeated multiple times." (AR 194.) Dr. Tran found that Plaintiff has "poor abstract thinking, poor insight and judgment, although she has adequate self-safety awareness. She has poor short-term recall ability and poor calculation." (AR 196.) Dr. Tran opined that Plaintiff "probably can do multitask sequencing but she should not make decisions regarding public safety." (AR 196.)

The ALJ, however, specifically addressed the findings of the treating physicians in his decision – "It has been noted that Ms. Thao has 'slow responses,' is a 'poor historian,' and is questionably 'learning disabled.'" (AR 13.) He also expressly considered the findings and conclusions of Dr. Tran and Dr. Hirokawa and noted their findings of mild to moderate limitations. (AR 16-17.) The ALJ then adopted the more restrictive finding that Plaintiff had "moderate difficulties" regarding pace. (AR 13.) Thus, "after carefully considering the entire record," the ALJ then incorporated these moderate pace limitations and found that Plaintiff "can perform simple, repetitive tasks."

An RFC of "simple, routine, repetitive work" adequately captures "moderate" deficiencies in pace. *See Stubbs-Danielson v. Astrue*, 539 F.3d 1169, 1173 (9th Cir. 2008). "[A]n ALJ's assessment of a claimant adequately captures restrictions related to concentration, persistence, or pace where the assessment is consistent with restrictions identified in the medical testimony." *Id*. at 1174. Here, the ALJ's RFC is consistent with the restrictions set forth in the medical records as indicated by the treating and examining physicians. As in *Stubbs-Danielson*, "[t]he ALJ translated [claimant's] condition, including the pace and mental limitations, into the only concrete restrictions available to him . . . [a] restriction to 'simple tasks.'" *Id*. As such, the ALJ's presentation to the VE of a hypothetical person limited to simple, repetitive tasks encompassed Plaintiff's limitations. The VE then testified that such a hypothetical person could perform numerous jobs available in the local and national economy. (AR 39-40.)

Further, the ALJ considered Plaintiff's mental impairment and found that she did not meet or medically equal the criteria of 20 C.F.R. Part 404, Subpart P, Appendix 1, Section 12.04, Paragraph B, which requires that at least two of the following requirements are met: (1) marked restriction of daily living activities; (2) marked difficulties in maintaining social functioning; (3) marked difficulties in maintaining concentration, persistence, or pace; and (4) repeated episodes

17

of decompensation, each of extended duration. 20 C.F.R. § 404, subp. P, app. 1, sec. 12.04 ¶ B. A "marked limitation" means more than moderate but less than extreme. *Id.* § 404, subp. P, app. 1, sec. 12.00 ¶ C. The ALJ found that Plaintiff had mild restriction in activities of daily living; moderate difficulties in social functioning; moderate difficulties in concentration, persistence, or pace; and no experienced episodes of decompensation that have been for an extended duration. (AR 13.) Because Plaintiff does not have at least two marked limitations or one marked limitation and repeated episodes of decompensation, the ALJ determined that she does not meet the "paragraph B" criteria. (AR 13.)

Plaintiff has not shown that the record supports a finding of marked difficulties in pace. Plaintiff admits that "[t]he ALJ did find a moderate concentration and pace limitation at Step 3," but argues that "the pace limitation was not addressed in the residual functional capacity." (Doc. 14, 14:23-25.) Yet the ALJ's decision expressly states that the "residual functional capacity assessment . . . in this case reflects the degree of limitation [he] found using the 'paragraph B' criteria." (AR 13.)

Plaintiff's additional argument that the ALJ failed to consider pace limitations based on the treating physician's findings that she could only work with "reminders" is not persuasive, as the treating notes indicate that Plaintiff was able to work with "restrictions." (AR 251.) Three sets of limitations and work restrictions are set forth by the treating physician: (1) no driving, work requiring climbing ladders, or use of powered equipment; (2) no repetitive bending or lifting; and (3) light work only (lift less than 20 pounds at one time). (AR 251.) The treating physician only indicated physical restrictions and did not place any mental restrictions on Plaintiff's ability to work.

In her reply, Plaintiff argues that the ALJ rejected her testimony concerning marked deficiencies of pace. Arguments made for the first time in a reply brief are waived. *See Omega Environmental, Inc. v. Gilbarco, Inc.*, 127 F.3d 1157, 1167 (9th Cir. 1997). Further, the ALJ's decision addresses Plaintiff's testimony, including the points raised in Plaintiff's reply argument that she cannot function for two to three days after a seizure, can only concentrate on a television program for 15 to 20 minutes, and can only read the newspaper for five minutes. (*See* AR 14.) The ALJ, however, determined that Plaintiff's statements were not credible to the extent that they were

inconsistent with his RFC assessment and provided extensive citations to the record to support his findings. (AR 14.) "Where, as here, the ALJ has made specific findings justifying a decision to disbelieve an allegation. . . , and those findings are supported by substantial evidence in the record, our role is not to second-guess that decision." *Fair v. Bowen*, 885 F.2d 597, 604 (9th Cir. 1989).

The ALJ's decision shows that he fully considered Plaintiff's medical records when making his determination, including the findings of the treating and examining physicians. (AR 12-17.) Accordingly, the ALJ applied the proper legal standard, and his decision is supported by substantial evidence in the record.

**CONCLUSION**

After consideration of the Plaintiff's and Defendant's briefs and a thorough review of the record, the Court finds that the ALJ's decision is supported by substantial evidence in the record as a whole and is based on proper legal standards. Accordingly, the Court DENIES Plaintiff's appeal from the administrative decision of the Commissioner of Social Security. The Clerk of this Court is DIRECTED to enter judgment in favor of Defendant Michael J. Astrue, Commissioner of Social Security, and against Plaintiff PA DEE THAO.

IT IS SO ORDERED.

**Dated:   June 21, 2011**                                    **/s/ Sheila K. Oberto**
                                                              UNITED STATES MAGISTRATE JUDGE